*In re* THOMPSON'S ESTATE.

FORSYTHE *v.* THOMPSON'S ESTATE.

1. ESTATES OF DECEDENTS—WORK AND LABOR—CONTRACTS—EVIDENCE—EXECUTORS AND ADMINISTRATORS.

   Statements of the deceased that he would do well by the claimant if she would remain and care for him, were admissible and have some tendency to prove a contract averred by the claimant to convey to her a certain farm or its value in money, besides paying a weekly compensation.

2. SAME.

   A conversation, wherein deceased inquired of the witness if he did not think that to give a certain other farm to claimant

would be advisable, does not disprove the contract claimed, but tends to indicate a desire to do more than the agreement required.

3. TRIAL—JURY—NEWSPAPER ARTICLES.
It is not ground for a new trial that the jurors read incorrect accounts of the case in newspapers.

4. DAMAGES—EXCESSIVE VERDICT—VALUE OF PERSONAL SERVICES.
A verdict of $9,000 for services rendered by claimant in caring for deceased and his aged brother and sister during three and one-half years, is excessive.

Error to Macomb; Erskine, J. Submitted May 6, 1909. (Docket No. 52.) Decided July 15, 1909.

Anna Forsythe presented a claim against the estate of James Thompson, deceased, for services rendered. The commissioners reported a failure to agree, and claimant appealed to the circuit court. A judgment for claimant is reviewed by defendant on writ of error. Affirmed conditionally.

*Henry J. McKay* ( *J. G. Tucker* and *O. C. Lungershausen,* of counsel ), for appellant.

*William T. Hosner* and *Seth W. Knight,* for appellee.

BROOKE, J. The appellant filed the following claim against the estate of James Thompson, deceased:

" COUNTY OF MACOMB—SS.

" The estate of James Thompson, deceased, debtor to Anna Forsythe. Said Anna Forsythe avers and claims damages in the sum of $15,000 for nonfulfillment of a contract made and entered into by and between herself and the deceased, James Thompson, in substance and effect as follows:

" Said claimant avers that upward of six years before the death of said James Thompson she went to live in the family of the said James Thompson, and remained in said family constantly up to and a short time after his death; that during the time she remained in the home of, and resided with, said Thompson she had the exclusive charge of the household, and did all the duties connected therewith,

and also did business for the said James Thompson upon his request and under his direction pertaining to his vast property interests; and that during a portion of the time it was necessary for her to be up a portion of and sometimes nearly all night administering to his wants and those of his brother and sister who lived with him.

" This claimant further avers and claims that a short time after going to the home of the said James Thompson he promised her that if she would remain with him until his death that he would do well by her, and that in addition to paying her so much a week, if she would refrain from marrying and stay in his home, and look after his wants and necessities until his death, that he would either deed her the farm on which he lived at the time of his death or leave her the value of the farm in money.

" Said claimant avers and claims that said farm is worth upwards of $15,000, and that she has performed her part of the agreement with the said James Thompson in every respect acting on the promise to leave her the farm aforesaid or its equivalent in money, fully believing and expecting that on his death that said farm would belong to her, and she went to work on good faith under said contract or agreement with the said James Thompson, with all her energy and perseverance and managed his household affairs and administered to his wants the same as though he had been her father, with all the energy, skill, and economy that she possessed, and administered as best she could to the comfort, happiness, and needs of the said James Thompson during his lifetime.

" Said claimant further avers and claims that a short time prior to his death the said James Thompson made arrangements to carry out his promise to her as set forth above by executing a deed of the farm where he lived, and was prevented from so doing by reason of the fact that he suffered a stroke which resulted in his demise.

" Claimant further claims for services performed by her for said James Thompson during the time that she was in his employ the sum of fifteen thousand dollars."

The commissioners on claims appointed by the probate court reported a failure to agree as to the foregoing claim. Upon appeal from the probate court claimant recovered a judgment in the sum of $9,000. The case is brought here for review by the estate.

It appears that the claimant in September, 1900, then a

girl of 19 years of age, entered the home of the decedent, James Thompson, as a domestic.  At that time the household of decedent consisted of himself, age 70 years, his brother Isaac, age 81 years, and his sister Abbie, age 82 years.  None of the three had ever married.  They had lived together upon a farm, called the "home farm," for a great many years.  This farm consists of 240 acres, and is valued at about $20,000.  When claimant first entered the service of James, she received the sum of $2 per week.  After a time her wages were raised to $3 per week, and during the last two years she received $4 per week.  She continued to reside in the home of decedent from September, 1900, until his death in August, 1906.  During this entire period of six years claimant had the care of the household for these three very old people.  Isaac, the elder brother, died about one month before the decease of James.  The title to the home farm was in Isaac and James as tenants in common.  About three years prior to the death of James Thompson he suffered a painful accident, breaking one arm and injuring the other severely.  For several weeks he was unable to use his arms, and was confined to the house from three to four months.  During this period the claimant, when necessary, dressed, washed, and fed him.

The claimant offered the following testimony to establish the contract between herself and the decedent: Her mother, Elmira Forsythe, testified that about a year and a half after claimant went to live with decedent he, decedent, desired to adopt claimant, and that witness objected to the adoption; that about a year later she had a conversation with decedent in which he said:

"If she would stay with him and do for him like she had done, that he would deed her the farm that they lived on because there would be nobody else do for him like she had done."

Daniel Witmer, merchant of Romeo, testified as follows:

"I was talking with him and Miss Forsythe was there

and about there and through the yard, and I says to Mr. Thompson, 'You have got quite a good looking housekeeper there;' and he says, 'Yes;' and I says, 'It is a wonder she will stay here, old people here and no company, younger people;' and he says, 'There is an object of her staying here. I promised if she would stay here as long as I live I will do well by her.' And that was practically all that he said, that he would do well by her. She was a good worker, she was a good housekeeper, and such as that."

Allan Hosner testified:

"He always spoke well of the girl. He claimed she was a nice smart girl, good girl to work and keep things up in nice shape, and made a better home than they had before, made quite a difference in the home. He said it made quite a big difference in their home. * * * He most always had something to say in favor of the girl. * * * I told him some fellow would come along and get her away from him, might. He might live quite a spell. She might not want to tie herself up there too long. Well, he said she had agreed to stay and he had agreed to do well by her if she did stay. Well, one time, I don't know whether it was that time or not, I told him probably he would give her something extra, maybe $4 or $5. He said, 'Yes,' if she stayed he would give her more than $4,000 or $5,000."

Mortimer Hilliker, a laboring man who worked for decedent on the farm about eight years, off and on, testified:

"Well, we was there in the barn, and the girl came out to go to the garden for something. I don't know what. And he says, 'There has been a good girl here;' and he says, 'I promised a good thing if she stay here during our lives, my life.' He says: 'And I am going to do it.' And he says: 'She has promised to stay.'"

John P. Wolcott, a business man of Mt. Clemens, testified:

"He said that if Anna stayed there and was a good girl, stayed with him while he lived, that she would be well provided for, or something to that effect."

Harry H. Lippincott, a business man of Romeo, testified:

"I said something to Anna in a joking way, and I said to him: 'She is regular sunshine here, ain't she, Jim?' I was as familiar with him as that. 'Yes,' he said, 'she is.' I said she had been with him quite a time. He said, 'Yes,' and 'she is going to stay with me, or has promised to stay with me, as long as I live and I have agreed to do something handsome by her.'"

George Forsythe, father of claimant, testified as to a conversation had with decedent a few days before his death:

"The conversation was that he expected a Mr. Webster down. He agreed to come down in about two weeks; but he hadn't come down, and that he said that he wanted to fix matters or papers, some papers up. He didn't think he would live a great while, and he wanted to make a deed of that farm to Anna, my daughter."

John E. Coope, wool buyer and grain buyer, testified:

"Why he told me that the girl—I told him, I says: 'Jim, you don't want to let as good a girl as that go.' He says: 'I ain't going to.' He says, 'She has agreed to stay with me as long as I live;' and he says, 'I am going to give her the farm. I am going to see that she gets it—the home farm.' This farm, that was the farm that he was talking about. * * * I asked him then, I says: 'Have you ever fixed up with Anna what you told me you was going to do?' He repeated it, you know. I says: 'Have you ever fixed it up?' He says: 'No.' But he says: 'Just as soon as I can get down town I am going to a lawyer and have it fixed up, and, well,' he said, 'just now don't you think if I would give Anna one of the farms over west and this thresher stock, and then she would always have an income?' 'Why,' I says, 'Jim, it is your own. It is none of my business,' I says: 'It is all your own. Do what you mind to with it.' I says: 'It is nobody's business.' The thresher stock was between $10,000 and $11,000. I cannot state the exact amount."

On cross-examination:

"Why, as he sat there, I says: 'It is more like living?' He says, 'Yes.' I says, 'You have got a good girl there, Jim. You want to keep her.' He says, 'I am going to.' He says, 'I'll tell you Coope,' he says, 'she has agreed to

stay and take care of me as long as I live; and I have agreed to give her a deed of this farm, and I am going to see that she gets it.'"

William H. Chapman, undertaker, testified:

"I had charge of the funeral of Isaac Thompson. James told me to order what flowers Anna thought necessary, and I asked him if I should limit her in regard to the amount. He said, 'No,' to let her use her own judgment, as he thought her taste in such matters was very good. He said he wanted her to sit with him as he considered her—he considered she had lived there so long that he considered her as one of the family. He said he wanted her to ride in the first carriage with him."

Harry Gray, grocer, of Romeo, testified:

"Miss Forsythe settled all accounts excepting the last account that was made, and Mr. Chamberlain settled that."

Testimony on behalf of the estate was introduced tending to show that claimant, after the death of decedent, acknowledged she had no claim.

Assignments of error 1, 2, 3, 4, 5, 43, and 47 relate to statements of deceased admitted against objection, and which it is claimed had no tendency to prove the specific agreement or contract which is made the basis of the claim. These assignments relate particularly to the testimony of the witnesses Witmer and Hosner. It is true, as urged by the counsel for the estate, that neither of these witnesses testified to the contract in the exact terms set out by the claimant, but we do not think it can be said that this testimony has no tendency to prove such a contract. It cannot be supposed that the decedent would go over in detail the terms of his contract with the claimant with every casual acquaintance. These witnesses' testimony, however, tends to show that there was a contract between decedent and claimant, by the terms of which claimant had agreed to stay with decedent until his death, in consideration of which he, decedent, had agreed to "do well by her."

Assignment 43 relates to the question asked of witness Coope, whose testimony has been quoted above, and which was received over objection by the defendant estate. It is the claim of the attorneys for the estate that these statements of deceased not only fail to substantiate the contract set up in the claim, but show that no such contract had been made. We cannot agree with the counsel for the estate in this. The query of the decedent of witness Coope, "Just now don't you think if I would give Anna one of the farms over west and this thresher stock, and then she would always have an income?"does not necessarily carry the inference that no contract had theretofore been made between decedent and claimant, but rather tends to indicate on the part of the decedent an anxiety to provide for claimant in a manner possibly more to her advantage than he had by his contract agreed to do.

Error is assigned upon the judge's charge. We have examined the charge with care, and believe that it fairly states the law governing the case.

A motion for a new trial was made, only two grounds for which we will examine. The seventh is as follows:

"Because during the trial of said cause, and before the same had been finally submitted to the jury, a number of jurors saw and read certain articles concerning said cause, published in the Mt. Clemens Monitor and Daily Leader on January 10, 1908, two papers published and circulated in the county of Macomb, said articles containing many immaterial and grossly prejudicial statements to defendant's case."

The fourth is as follows: "Because said verdict was grossly and unreasonably excessive." With reference to the seventh reason above quoted, it is apparent from the record that the articles published in Mt. Clemens daily papers were read by some of the jurors prior to the rendition of the verdict. The articles themselves are, as is frequently the case, somewhat colored. They give the amount of the decedent's estate at more than double what it actually was as testified to in the record. They like-

wise assume to state that the commissioners on claims were favorable to the claimant, but were unable to agree upon the sum she should receive. We cannot presume that the jurors would be influenced by the reading of these articles to render a verdict contrary to the sworn testimony in the case. Jurors of intelligence usually read the newspapers in their respective localities, and, if every trial is to be a mistrial because of the fact that misinformation reaches the jurors' hearing during the trial of a case outside the courtroom, there would be no end to litigation. A somewhat similar assignment of error was considered by this court in the case of *Sherwood* v. *Railway Co.*, 88 Mich. 108 ( 50 N. W. 101 ), where this court, through Mr. Justice GRANT, in commenting upon the publication of the amount of a former verdict, said:

" It is, indeed, desirable that such things, so far as possible, should be kept from the knowledge of the jury, but, however unwise it may be to publish them at the time of the trial, no violation of law is committed in so doing, nor will the reading of them by jurors render them incompetent."

As to the fourth ground urged as a reason for a new trial, we think that the learned circuit judge erred in his determination that the verdict was not grossly and unreasonably excessive. The record we think shows by a fair preponderance of the evidence that the decedent made the contract relied upon by the claimant. After the making of the contract, the claimant spent about three years and a half in the society of the decedent and his aged brother and sister. It is quite clear that for her manual labor her weekly stipend may have been adequate, but it is equally true that such compensation might not have been sufficient to induce a young woman to forego the ordinary activities common to her age and sex and devote herself to the care of three aged people. The comfort and pleasure which the decedent received by reason of her society and ministration cannot readily be valued. The making of the contract relied upon affords

some evidence of the value decedent placed upon them. The value of the services of an ordinary domestic or a trained nurse may be readily ascertained, but this record details many incidents which show that the claimant occupied a position in the family of the decedent quite apart from either of these relations. The value of claimant's services is the true measure of her recovery; those services include, however, more than mere manual labor or expert nursing.

We are nevertheless of the opinion that the verdict was an excessive one. As pointed out by counsel for the estate, the verdict gives claimant $50 per week for the entire period of her service after the contract was made, in addition to what she had already received. This sum, under all the circumstances disclosed by the record in this case, we hold to be too great.

The judgment will be reversed and a new trial ordered unless the claimant remits the sum of $2,000, in which event the judgment will stand affirmed at the sum of $7,000. No costs of this appeal will be allowed to either party.

BLAIR, C. J., and HOOKER, MOORE, and McALVAY, JJ., concurred.